# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 12, 2014

Lyle W. Cayce
Clerk

No. 13-50582

CATHOLIC LEADERSHIP COALITION OF TEXAS, doing business as Texas Leadership Coalition; TEXAS LEADERSHIP COALITION-INSTITUTE FOR PUBLIC ADVOCACY; FRIENDS OF SAFA TEXAS; TEXAS FREEDOM PAC,

Plaintiffs-Appellants

v.

DAVID A. REISMAN, In his official capacity as Executive Director of the Texas Ethics Commission; HUGH C. AKIN, In his official capacity as a member of the Texas Ethics Commission; TOM HARRISON, In his official capacity as a member of the Texas Ethics Commission; JIM CLANCY, In his official capacity as a member of the Texas Ethics Commission; PAUL W. HOBBY, In his official capacity as a member of the Texas Ethics Commission; BOB LONG, In his official capacity as a member of the Texas Ethics Commission; PAULA M. MENDOZA, In her official capacity as a member of the Texas Ethics Commission; TOM RAMSAY, In his official capacity as a member of the Texas Ethics Commission; CHASE UNTERMEYER, In his official capacity as a member of the Texas Ethics Commission; SUSAN REED, In her official capacity as District Attorney for Bexar County, Texas,

Defendants-Appellees

Appeal from the United States District Court
for the Western District of Texas

Before BARKSDALE, CLEMENT, and OWEN, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:*

---

* Judge Barksdale concurs in this opinion with the exception of Section III.B.

No. 13-50582

To form a "general-purpose committee"—a type of political action committee devoted to promoting a particular point of view—in Texas, a group of persons must appoint a committee treasurer and register with the Texas Election Commission. The nascent general-purpose committee must then collect contributions from ten contributors, and wait sixty days before exceeding $500 in contributions and expenditures. And even after collecting contributions from ten donors and waiting sixty days, the political committee is forever barred from accepting corporate contributions unless the committee solely engages in independent expenditures.

Plaintiffs-Appellants, three general-purpose political committees and one nonprofit corporation, raise facial and as-applied First Amendment challenges[1] to the treasurer-appointment requirement, the ten-contributor requirement, and the 60-day, 500-dollar contribution and expenditure limit. One of the general-purpose committees and the nonprofit corporation also bring a First Amendment challenge to the corporate contribution ban as-applied to a proposed contribution of an email contact list from the nonprofit corporation to the general-purpose committee. The general-purpose committee avers that the email contact list will only be used in support of independent expenditures.

The district court, after determining that the case was not moot, upheld the constitutionality of all of the challenged provisions of the Texas Election Code on cross-motions for summary judgment. We now hold that the treasurer-appointment requirement and the corporate contribution ban are constitutional. However, we conclude that the 60-day, 500-dollar contribution and expenditure limit as well as the ten-contributor requirement are facially

---

[1] The First Amendment is incorporated against the states via the Due Process Clause of the Fourteenth Amendment. *See, e.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 749 n.1 (1976).

No. 13-50582

unconstitutional under the First Amendment. We therefore AFFIRM IN PART; REVERSE and RENDER IN PART; and REMAND for further proceedings consistent with this opinion.

## I.

## A.

Because this appeal concerns the intersection of various limitations on the behavior of, and permissible donations to, political committees in Texas, we first review the relevant definitions and regulations in the Texas Election Code.

## 1.

Under Texas law, a political committee is "a group of persons that has as a principal purpose accepting political contributions or making political expenditures." Tex. Elec. Code § 251.001(12).[2] The Election Code further distinguishes between two different types of committees: general-purpose committees and specific-purpose committees. A general-purpose committee is a political committee that has "among its principal purposes":

(A)    supporting or opposing:
     (i)    two or more candidates who are unidentified or are seeking offices that are unknown; or
     (ii)    one or more measures that are unidentified; or
(B)    assisting two or more officeholders who are unidentified.

Tex. Elec. Code § 251.001(14). A political committee that is dedicated to supporting candidates of a particular point of view (*e.g.*, pro-life or pro-choice candidates) is a general-purpose committee because the committee's fidelity lies with the committee's particular *perspective* rather than any specific

---

[2]    *See also* Tex. Ethics Comm'n, Ethics Advisory Op. No. 242 (1995) (discussing whether a nonprofit constitutes a political committee).

*candidates*.[3]    In such circumstances, the candidates supported by the committee are formally considered to be "unidentified" because candidates can gain or lose the committee's support depending on their policy positions.[4] Finally, for the purpose of determining general-purpose committee status, all that matters is that *some* of the committee's activities qualify as the activities of a general-purpose committee.[5]

Texas law contrasts general-purpose committees with specific-purpose committees.    Specific-purpose committees are defined in opposition to a general-purpose committee—they are those committees that do "not have among its principal purposes those of a general-purpose committee," but rather have as a "primary purpose":

(A)    supporting or opposing one or more:
    (i)    candidates, all of whom are identified and are seeking offices that are known; or
    (ii)    measures, all of which are identified;
(B)    assisting one or more officeholders, all of whom are identified; or
(C)    supporting or opposing only one candidate who is unidentified or who is seeking an office that is unknown.

Tex. Elec. Code § 251.001(13).  Committees supporting or opposing a particular candidate (*e.g.*, Friends of Jefferson Smith, Opponents of Joseph Paine) named in the committee's disclosures to the Texas Ethics Commissions constitute specific-purpose committees.[6]

---

[3] *See generally* Tex. Ethics Comm'n, Campaign Finance Guide for Political Committees 2 (Nov. 2012 Rev.).

[4] *See id.*

[5] *See id.* ("If a political committee engages in any of the activities described in this section, it is a general-purpose committee, regardless of what else the committee does."); *see also id.* ("A general-purpose committee devoted to a particular point of view does not become a specific-purpose committee because it lends support to a particular candidate in an election.").

[6] Specific-purpose committees may support multiple candidates as long as the committee's support of the candidates is properly disclosed.

No. 13-50582

Texas also has two broad categories of political spending: contributions and expenditures. A contribution is "a direct or indirect transfer of money, goods, services, or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a transfer." *Id.* § 251.001(2). A "political contribution" includes both campaign contributions—contributions that are "offered or given with the intent that it be used in connection with a campaign for elective office or on a measure," regardless of when the contribution is made, *id.* § 251.001(3)—and officeholder contributions—contributions that are "offered or given with the intent that it be used to defray expenses that: (A) are incurred by the officeholder in performing a duty or engaging in an activity in connection with the office; and (B) are not reimbursable with public money." *Id.* § 251.001(4); *see also id.* § 251.001(5) (defining political contribution). Donations to either a candidate or a political committee (whether general-purpose or specific-purpose) count as contributions. *See id.* § 251.001(3)-(4).

Meanwhile, an expenditure is "a payment of money or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a payment." *Id.* § 251.001(6).[7] And, as with the definition of "political contribution," a "political expenditure" includes both "officeholder" expenditures and "campaign" expenditures. *Id.* § 251.001(10).

- An officeholder expenditure is an "expenditure made by any person to defray expenses that: (A) are incurred by an officeholder in performing a duty or engaging in an activity in connection with the office; and (B) are not reimbursable with public money." *Id.* § 251.001(9).

---

[7] It is important not to conceive of expenditures and contributions in opposition to each other. Rather, contributions are best thought of as a subset of expenditures: all contributions are expenditures, but not all expenditures are contributions.

No. 13-50582

- A "campaign expenditure" is "an expenditure made by any person in connection with a campaign for an elective office or on a measure," regardless of when it was made. *Id.* § 251.001(7).

In addition, Texas further denotes what will be an important subset of campaign expenditures: "direct campaign expenditures."  Under Texas law, a "direct campaign expenditure" is "a campaign expenditure that does not constitute a campaign contribution by the person making the expenditure." *Id.* § 251.001(8).  Thus only expenditures made without the prior consent or approval of a candidate for office constitute "direct campaign expenditures" (otherwise, the expenditure would also count as a political contribution). Accordingly, the Texas Supreme Court has explained that "direct campaign expenditures" constitute the equivalent of "independent expenditures" under federal campaign finance law. *See Osterberg v. Peca*, 12 S.W.3d 31, 36 n.2 (Tex. 2000).  This opinion will refer to direct campaign expenditures as independent expenditures in order to avoid confusion.

**2.**

The Texas Election Code regulates the formation of general-purpose committees.  Chief among the provisions governing the formation of general-purpose committees is Texas Election Code § 253.037(a).  Section 253.037(a) provides that:

> A general-purpose committee may not knowingly make or authorize a political contribution or political expenditure unless the committee has:
>
> > (1)    filed its campaign treasurer appointment not later than the 60th day before the date the contribution or expenditure is made; and
> >
> > (2)    accepted political contributions from at least 10 persons.

In addition to § 253.037(a), Texas Election Code § 253.031(b) provides that:

6

No. 13-50582

> A political committee may not knowingly accept political contributions totaling more than $500 or make or authorize political expenditures totaling more than $500 at a time when a campaign treasurer appointment for the committee is not in effect.

The two provisions stand uncomfortably together. Based on the plain text of § 253.037(a) a political committee may engage in no expenditures until a committee treasurer has been appointed and sixty days have passed. By contrast, the plain text of § 253.031(b) permits a political committee to engage in $500 of expenditures before the appointment of a campaign treasurer.

The Texas Ethics Commission resolved the tension between the two provisions in a 1993 ethics opinion. The Commission reads the two provisions together to prohibit a general-purpose committee from making or authorizing "political expenditures totaling more than $500 unless the committee has (1) filed its campaign treasurer appointment no later than the 60th day before the date the expenditure is made that causes the total expenditure to exceed $500, and (2) accepted political contributions from at least 10 persons." Tex. Ethics Comm'n, Ethics Advisory Op. No. 161 (1993). Accordingly, at present under Texas law, there are three prerequisites that a general-purpose committee must meet before it can fully engage in the political activity otherwise permitted by law:

- Appoint a committee treasurer (the "treasurer appointment requirement"). The treasurer plays a central role in ensuring compliance with Texas's disclosure requirements.
- Engage in less than an aggregate $500 of political expenditures and political contributions for a 60-day window after the treasurer is appointed (the "60-day, 500-dollar limit").[8] The 60-day, 500-dollar

---

[8] This limit also applies to expenses for political fundraising. As the Texas Ethics Commission explained, "[a]ny expenditures related to political fundraising, including

7

limit does not apply to a general-purpose committee affiliated with a federal multicandidate political committee registered with the Federal Elections Commission. *See* Tex. Elec. Code § 253.037(c).

- Receive donations from ten contributors (the "ten-contributor requirement").

A violation of these requirements is a Class A misdemeanor under Texas law. *See id.* §§ 253.031(f), .037(d).

Texas claims that these restrictions are modeled on the prerequisites for obtaining federal multicandidate political committee status. In order to be classified as a multicandidate political committee under federal law, a political committee must (1) have been registered as a political committee with the FEC for six months,[9] (2) received contributions from fifty persons, and (3) made contributions to at least five candidates for federal office. *See* 2 U.S.C. § 441a(a)(4); 11 C.F.R. § 100.5(e)(3). Once a committee obtains federal multicandidate committee status, the committee is rewarded with higher base contribution limits to candidates, parties, and political committees. *See* 2 U.S.C. § 441a(a)(2).

There are, however, a couple of relevant differences between federal multicandidate committees and general-purpose committees in Texas. For example, whereas committees waiting to obtain federal multicandidate committee status are permitted to engage in unlimited independent expenditures,[10] Texas limits general-purpose committees to only $500 of independent expenditures. *See* Tex. Ethics Comm'n, Ethics Advisory Op. No.

---

expenditures to hire a person to generate political contributions for the committee, are political expenditures and are thus subject to the waiting period." Tex. Ethics Comm'n, Ethics Advisory Op. No. 177 (1993).

[9] *See* 2 U.S.C. § 433.

[10] *See Buckley v. Valeo*, 424 U.S. 1, 51 (1976); *Cal. Med. Ass'n v. FEC*, 641 F.2d 619, 624 (9th Cir. 1980) (en banc) (describing effect of *Buckley*).

161 (1993). Further, whereas federal political committees that do not qualify as a multicandidate committee are still permitted to engage in contributions provided that they comply with the *base* per-candidate, per-party, and per-committee contribution limits applicable to individual contributors,[11] Texas limits newly-formed general-purpose committees to an aggregate $500 in political contributions.

Despite the restrictive limits on general-purpose committees set out by Texas Election Code § 253.037(a), the committee may generally engage in unlimited expenditures and contributions once it has complied.[12] And once a general-purpose committee has complied with § 253.037(a), Texas law also grants that general-purpose committee certain advantages over specific-purpose committees. Unlike specific-purpose committees, general-purpose committees are not required to identify the specific candidates or measures that the committee supports or opposes. *See* Tex. Elec. Code § 251.001(14). And, unlike specific-purpose committees, which are limited in the contributions they can receive during legislative sessions and judicial elections in some circumstances, general-purpose committees may continue to receive contributions. *See id.* §§ 253.034(a), .153(a). Further, general-purpose and specific-purpose committees have different disclosure obligations in the nine days before an election: general-purpose committees have greater reporting obligations related to independent expenditures than specific-purpose committees, but specific-purpose committees must report a greater number of received contributions. *Compare id.* § 254.038 (specific-purpose committees), *with id.* § 254.039 (general-purpose committees).

---

[11] *See McCutcheon v. FEC*, 134 S. Ct. 1434, 1442 n.3 (2014) (plurality opinion).

[12] Texas subjects general-purpose committees to spending limits in judicial elections. *See* Tex. Elec. Code § 253.160.

No. 13-50582

**3.**

Also at issue are Texas's restrictions on corporate contributions to political committees. Under Texas law, "[a] corporation or labor organization may not make a political contribution that is not authorized by this subchapter." Tex. Elec. Code § 253.094(a). Given Texas's broad definition of what constitutes a political contribution, corporations are generally prohibited from transferring money (or any other thing of value) directly to a candidate or a political committee in connection with a campaign for elective office.

Despite the general bar on corporate political contributions, corporations do retain the ability to participate in Texas politics. After *Citizens United v. FEC*, 558 U.S. 310 (2010), the Texas Legislature amended the Texas Election Code to permit corporations to engage in unlimited independent expenditures directly from corporate funds. *See* Acts 2011, 82nd Leg. R.S., ch. 1009. Further, our decision in *Texans for Free Enterprise v. Texas Ethics Commission* approved of corporate contributions to independent-expenditure-only committees. *See* 732 F.3d 535, 537-38 (5th Cir. 2013).

**B.**

**1.**

Plaintiffs-Appellants are various entities seeking to influence Texas politics.

Catholic Leadership Coalition of Texas, primarily known as the Texas Leadership Coalition ("TLC"), is a 501(c)(4) nonprofit corporation whose "mission primarily is to evangelize and to educate the Catholic community with regards to faith and . . . the teaching[s] of the church." TLC seeks to "develop resources and opportunities to inform Catholics about the moral precepts of the Church pertaining to their responsibilities as Catholic voters." After the May 2012 Texas primary elections, TLC believed it needed to move beyond the

education realm and into direct candidate advocacy. On the advice of election lawyers, TLC decided to form a general-purpose committee to engage in direct advocacy.

TLC named the new independent entity the Texas Leadership Coalition-Institute for Public Advocacy ("TLC-IPA"). Plaintiff TLC-IPA registered with the Texas Ethics Commission on June 7, 2012. Therefore, under Texas law, TLC-IPA was required to comply with the 60-day, 500-dollar limit until August 6, 2012. Compliance with the 60-day, 500-dollar limit greatly hindered TLC-IPA's participation in a July 2012 run-off election. Though during the July 2012 run-off election TLC-IPA sought only to make independent expenditures, TLC-IPA has since made a few direct contributions to candidates, and may do so again in the future. Accordingly, TLC-IPA is not an independent-expenditure-only committee.

TLC wishes to make an in-kind contribution of its email list to TLC-IPA. TLC-IPA wishes to accept the donation so that it can use TLC's email list in support of its independent expenditures. However, TLC is barred by doing so by Texas's ban on corporate contributions to committees because TLC-IPA is not an independent-expenditure-only entity. *See* Tex. Elec. Code § 253.094(a); *see also Texans for Free Enter.*, 732 F.3d at 537-38 (holding that Texas cannot ban corporate contributions to independent-expenditure-only committees).

Plaintiff Friends of SAFA[13] Texas ("FOFSA") is also a general-purpose committee. FOFSA was formed to fund both independent expenditures and contributions to nonfederal candidates. FOFSA registered with the Texas Ethics Commission on July 19, 2012, and was limited in the political activities it could perform until the 60-day waiting period expired on September 17,

---

[13] SAFA stands for the San Antonio Family Association. SAFA is a 501(c)(3) nonprofit organization.

No. 13-50582

2012. Those requirements precluded FOFSA from engaging in the campaign activities that it wished to, including fully participating in the July 2012 run-off election, as well as opposing the legislative efforts and reelection campaign of then-Mayor Julian Castro.

The final general-purpose committee plaintiff, Texas Freedom, registered with the Texas Ethics Commission on June 29, 2012. Texas Freedom wished to contribute campaign services such as phone banking and blockwalking activities to "Hispanic candidates who adhere to core conservative values." Texas Freedom alleges the 60-day, 500-dollar limit hindered it in its fundraising and organizational efforts, thereby affecting its ability to fully participate in the 2012 elections.

**2.**

Plaintiffs-Appellants Texas Leadership Coalition (the 501(c)(4)) and Texas Leadership Coalition-Institute for Public Advocacy (the general-purpose committee) filed suit in the Western District of Texas on June 28, 2012. They sought a preliminary injunction against the enforcement of Section 253.037(a)'s 60-day, 500-dollar limit, Section 253.037(a)'s ten-contributor requirement, and Section 253.094(a)'s ban on corporate contributions to committees as applied to the in-kind donation of an email contact list from TLC to TLC-IPA. Defendants-Appellees are the members of the Texas Ethics Commission, and Susan Reed, the District Attorney of Bexar County. All are sued in their official capacities, and will collectively be referred to as "Texas."

The district court denied the preliminary injunction request, finding that even though it could not gauge Plaintiffs' likelihood of success or the possibility of irreparable harm given the last-minute nature of the preliminary injunction request, the balance of hardships and the public interest strongly supported denying an injunction to avoid creating chaos in the Texas campaign finance system so close to an election. Plaintiffs appealed, and a motions panel of this

court affirmed.  The motions panel noted that "[b]ased on the limited record before us, we are unpersuaded that there is a likelihood of success on the merits of Appellants' First Amendment challenge to the sixty-day waiting period." *Catholic Leadership Coal. of Tex. v. Reisman*, 473 F. App'x 402, 403 (5th Cir. 2012).  The panel therefore concluded that "the district court did not abuse its discretion in denying Appellants' motion for preliminary injunction." *Id.*

After the denial of the preliminary injunction, Plaintiffs twice amended the complaint to add Friends of SAFA Texas and Texas Freedom as plaintiffs. The parties cross-moved for summary judgment at the conclusion of discovery. The district court granted summary judgment for Texas.

The district court's summary judgment order began by addressing mootness.   Texas argued that Plaintiffs' challenges to the treasurer-appointment requirement, the ten-contributor requirement, and the 60-day, 500-dollar limit were moot after the general-purpose committees had registered with the Ethics Commission, amassed ten contributors, and sixty days had passed.  The court, however, determined that Plaintiffs' challenges fit within the "disputes capable of repetition yet evading review" exception to mootness.   The court found that full litigation of the dispute would be impractical during the 60-day/ten-contributor waiting period, and further held that the Plaintiffs did not have to prove that they would suffer the same injury again because this was an election law dispute.  Finally, the court noted that "policy considerations counsel in favor of resolving this case rather than dismissing it," because starting the case over again with a different organization would be wasteful and "would deprive the numerous other political committees across the state of an opportunity for clarity in the challenged provisions of the Texas Election Code."

The district court then turned to the merits of the dispute.  The court first rejected Plaintiffs' prior restraint arguments. The court distinguished

Texas's campaign-finance rules from unconstitutional prior restraints on the grounds that Texas did not require committees "to seek a license or permit, nor must such committees be 'approved' by any authority figure." Texas's rules, explained the court, were grounded in preventing circumvention of Texas's disclosure filing requirements—not licensing speech.

Next came Plaintiffs' challenges under *Buckley v. Valeo*, 424 U.S. 1 (1976), to the 60-day, 500-dollar limit and the ten-contributor requirement. The district court characterized the provisions as measures designed to prevent circumvention of Texas's disclosure requirements, and accordingly chose to apply the level of scrutiny applicable to disclosure regulations when evaluating the challenged provisions' constitutionality. In doing so, the district court declined to apply the even-more-heightened levels of scrutiny applicable to contribution and expenditure limits.

The court determined that the 60-day, 500-dollar limit and the ten-contributor requirement withstood constitutional scrutiny. With respect to the 60-day, 500-dollar limit, the court emphasized the extensive alternative methods of engaging in political speech in Texas. Therefore the court characterized the 60-day window as a minor burden—particularly given that by timely registering with the Texas Elections Commission, a general-purpose committee could determine when the 60-day window occurred. The court further found the minor burden imposed was well-justified as an anticircumvention measure that prevented late-forming political committees from being able to avoid Texas's disclosure requirements. With respect to the ten-contributor requirement, the district court determined the requirement imposed only a minor hurdle and furthered a sufficiently important state interest because it "ensures the committee is actually a committee and not merely an individual seeking to disguise his or her personal contributions."

After dispatching the Plaintiffs' *Buckley* challenges to the 60-day, 500-dollar limit and the ten-contributor requirement, the district court turned to the Plaintiffs' argument that the ten-contributor requirement unconstitutionally forced association because it required members wanting to form a general-purpose committee to associate with ten other individuals before speaking. To determine the constitutionality of the ten-contributor requirement, the district court examined whether Texas "demonstrate[d] a sufficiently important interest and employ[ed] means closely drawn to avoid unnecessary abridgment of associational freedoms." The court concluded Texas did: the ten-contributor requirement was closely drawn to ensure that general-purpose committees were not utilized by small groups of individuals to evade campaign finance disclosure requirements. Accordingly, the district court granted summary judgment that the ten-contributor requirement was constitutional.

Finally, the district court rejected Plaintiffs' as-applied challenge to the corporate contribution ban. The court determined that, because the committee at issue was not an independent expenditure-only committee, Texas had both an anticorruption and anticircumvention interest in banning corporate contributions to the committee because unlimited corporate contributions to the committee would risk *quid pro quo* corruption or its appearance. Therefore, the court granted summary judgment for Texas that the corporate contribution ban was constitutional as-applied to the proposed in-kind contribution of the email list.

Plaintiffs then filed the instant appeal. Plaintiffs argue that (1) the district court applied the wrong standard of review in rejecting the *Buckley* challenges to the 60-day, 500-dollar limit and the ten-contributor requirement, and under the proper level of scrutiny both requirements are unconstitutional, (2) the ten-contributor requirement is unconstitutional because it forces

association, (3) the treasurer-appointment requirement is an unconstitutional prior restraint, and (4) Texas's corporate contributions ban to political committees is unconstitutional as-applied. Texas responds that (1) the district court erred in determining that the Plaintiffs' challenges were not moot, and we lack jurisdiction to consider most of the Plaintiffs' appeal, and (2) even if this court were to reach the merits of the Plaintiffs' challenges, the campaign-finance regulations at issue are constitutional, and summary judgment was properly granted.

## II.

This court reviews questions of mootness de novo. *See, e.g., Ctr. For Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006). We also review a district court judgment rendered on cross-motions for summary judgment de novo. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 180 (5th Cir. 2009). We independently review each motion with its supporting proof. *Id.* Summary judgment is proper when the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III.

We address at the outset whether we have jurisdiction to consider all of the Plaintiffs' claims of unconstitutionality. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1988). Texas argues most of the case is moot, and therefore we lack jurisdiction to consider Plaintiffs' challenges to the 60-

day, 500-dollar limit, the ten-contributor requirement, and the treasurer-appointment requirement.[14]

## A.

"A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (internal quotation marks omitted). Because sixty days have passed since the general-purpose committees suing here appointed a treasurer and registered with the Texas Ethics Committee, and each committee has amassed ten contributors, Texas Election Code § 253.037(a) no longer limits the committees' political expenditures or contributions. And if Texas Election Code § 253.037(a) no longer limits the committees' expenditures and contributions, then Texas suggests the Plaintiffs lack a legally cognizable interest in the outcome of the case because a determination that Texas Election Code § 253.037(a) was unconstitutional would not expand the Plaintiffs' ability to engage in expenditures or contributions.

In response to Texas's mootness arguments, Plaintiffs invoke the disputes capable of repetition, yet evading review exception to mootness. *See, e.g.*, *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515-16 (1911). To fall within the exception, a plaintiff must show "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Wilson v. Birnberg*, 667 F.3d 591, 596 (5th Cir. 2012). A plaintiff seeking to invoke the exception has the

---

[14] Texas concedes that Plaintiffs' as-applied challenge to Texas Election Code § 253.094(a) is not moot.

burden of demonstrating its applicability. *See Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010).

Both parties agree that the first prong of the test is met. *See, e.g.*, *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) ("*WRTL II*"); *Carmouche*, 449 F.3d at 661. Instead, they dispute whether Plaintiffs make a "reasonable showing that [they] will again be subjected to the alleged illegality." *City of L.A. v. Lyons*, 461 U.S. 95, 109 (1983).

This case is not moot. The Supreme Court has explained that "[o]ur concern" in capable of repetition, yet evading review cases is "whether the controversy was *capable* of repetition and not . . . whether the claimant had demonstrated that a reoccurrence of the dispute was more probable than not." *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988). Plaintiffs need not demonstrate with "mathematical precision" that they will be subject to the same illegality; rather, Plaintiffs just need to show "a reasonable expectation" that the challenged illegality will reoccur. *Id.* Plaintiffs make that showing: even though Plaintiffs' *expenditures* are no longer limited by § 253.037(a), Plaintiffs' ability to *receive contributions* from newly-formed general-purpose committees is still limited by § 253.037(a).

Notably, under Texas law, general-purpose committees can contribute to other general-purpose committees provided that the donations are properly disclosed. *See, e.g.*, Tex. Elec. Code § 253.037(b). The treasurer-appointment requirement, 60-day, 500-dollar limit, and ten-contributor requirement therefore affect general-purpose committees in at least two ways:

- Until a committee appoints a treasurer, acquires ten contributors, and sixty days pass, § 253.037(a) limits the committee to only $500 worth of expenditures and contributions.
- After the 60-day window has passed and the committee has acquired ten contributors, § 253.037(a) limits the committee's ability to receive

contributions from newly-formed general-purpose committees that are subject to § 253.037(a).

The continuing limitation that § 253.037(a) creates on a general-purpose committee's ability to receive contribution establishes a reasonable expectation that these Plaintiffs will again be subjected to the challenged provisions of § 253.037(a). *See, e.g.*, *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 175 (5th Cir. 2011). That the precise injury the Plaintiffs will suffer is slightly different does not matter: Plaintiffs seeking to invoke the exception need not show they will suffer the exact same injury so long as the injury is caused by the same alleged illegality,[15] and both the contributing and the contributed-to party have sufficient injuries-in-fact to challenge campaign finance restrictions. *See, e.g.*, *McCutcheon v. FEC*, 134 S. Ct. 1434, 1443-44 (2014) (plurality); *In re Cao*, 619 F.3d 410, 421 (5th Cir. 2010) (en banc).

Moreover, the Texas Leadership Coalition (the 501(c)(4)) is not limited to trying to form only one general-purpose committee. As such, given its professed desire to continue trying to educate Catholic voters regarding their religious obligations, it is reasonable to believe that TLC may again be impacted by Tex. Elec. Code § 253.037(a). *See, e.g.*, *Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 399 (5th Cir. 2000).

We conclude Plaintiffs can invoke the disputes capable of repetition, yet evading review exception to mootness. They can show that (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that, as either (i) the forming or (ii) the contributed-to party, the plaintiffs will again be impacted by

---

[15] *See, e.g.*, *WRTL II*, 551 U.S. at 463; *cf. Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993) ("The new ordinance may disadvantage them to a lesser degree than the old one, but . . . it disadvantages them in the same fundamental way.").

No. 13-50582

the treasurer appointment requirement, the 60-day, 500-dollar limit, and the ten-contributor requirement.

**B.**

Plaintiffs' challenge is not moot for an additional reason. Our prior cases, which as a panel of this court we must follow, have concluded that in election law disputes "the Supreme Court has not always required that there be a likelihood that the same complaining party will be subject to the challenged action later." *Wilson*, 667 F.3d at 596. Therefore, this court "dispens[es] with the same-party requirement" in election law cases, "and focus[es] instead upon the great likelihood that the issue will recur between the defendant and the other members of the public at large." *Kucinich v. Tex. Democratic Party*, 563 F.3d 161, 165 (5th Cir. 2009) (internal quotation marks omitted); *see also Moore v. Hoseman*, 591 F.3d 741, 744 (5th Cir. 2009).

Under the standard articulated in *Wilson*, *Moore*, *Kucinich*, and *Carmouche*, a plaintiff seeking to invoke the exception must show that "other individuals certainly will be affected by the continuing existence" of the challenged provision. *Carmouche*, 449 F.3d at 662. Accordingly, "not every election case fits within the four corners of the capable-of-repetition but evading-review exception." *Wilson*, 667 F.3d at 596 (internal quotation marks and alterations omitted). For example, cases involving "strictly personal" harm, *id.* at 597, or cases where the plaintiffs fail to show that the challenged illegality will again occur, *see, e.g.*, *Dardenne*, 595 F.3d at 217-18, do not fit within the exception. But, in election law cases such as this one, where (1) the state plans on continuing to enforce the challenged provision, and (2) that provision will affect other members of the public, the exception is met. *See,*

*e.g.*, *Moore*, 591 F.3d at 745; *Kucinich*, 563 F.3d at 165; *Carmouche*, 449 F.3d at 662.[16]

## IV.

## A.

"The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute." *McCutcheon*, 134 S. Ct. at 1441. We apply the framework begun in *Buckley v. Valeo* to determine whether a campaign-finance regulation represents an unconstitutional intrusion on protected First Amendment rights.[17] *Buckley* and its progeny instruct that we should give varying levels of constructional scrutiny to campaign-finance regulations depending on the type of regulation at issue:

- Expenditure limitations receive "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Buckley*, 424 U.S. at 44-45. A regulation limiting expenditures may only be upheld if the regulation "promotes a compelling interest and is the least restrictive means to further the articulated interest." *McCutcheon*, 134 S. Ct. at 1444.[18]

- Contribution limitations receive a lessened, but nonetheless rigorous, level of scrutiny. Regulations limiting contributions may

---

[16] Texas's attempts to argue that this case is somehow not sufficiently an election law case so as to fall within the exception are not well-taken given that Texas's primary justification on the merits for the limits' constitutionality concerns their role in preventing last-minute circumvention of disclosure requirements during an *election*.

[17] Texas suggests analyzing these regulations as time, place, and manner restrictions on speech. We decline Texas's invitation. *See, e.g.*, *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 386 (2000) (noting *Buckley*'s rejection of time, place, and manner restriction analysis).

[18] *See also Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (noting high level of scrutiny given to regulations limiting political speech).

only be upheld if "the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Id.* (internal quotation marks omitted).

- Disclosure and organizational requirements receive a further lessened level of scrutiny. To defend disclosure and organizational requirements, the government must show a "sufficiently important governmental interest that bears a substantial relation" to the requirement. *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010) (en banc) (internal quotation marks omitted).[19]

Under each of the tests, the government has the burden of demonstrating the constitutionality of its actions. *McCutcheon*, 134 S. Ct. at 1452.

For defending expenditure and contribution limitations, the Supreme Court "has identified only one legitimate governmental interest . . . : preventing corruption or the appearance of corruption." *McCutcheon*, 134 S. Ct. at 1450. Moreover, the anticorruption rationale itself "is not boundless." *Emily's List v. FEC*, 581 F.3d 1, 6 (D.C. Cir. 2009). Recent Supreme Court case law clarifies that the government's interest in preventing corruption is limited to preventing *quid pro quo* corruption or its appearance. *McCutcheon*, 134 S. Ct. at 1450-51.[20] "[G]overnment regulation may not target

---

[19] *See also Citizens United*, 558 U.S. at 366-67; *Vt. Right to Life Comm. v. Sorrell*, ___ F.3d ___, 2014 WL 2958565, at *11 (2d Cir. July 2, 2014); *Worley v. Fl. Sec'y of State*, 717 F.3d 1238, 1242-45 (11th Cir. 2013); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 476-77 (7th Cir. 2012); *The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 548-49, 551 n.3 (4th Cir. 2012); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 55 (1st Cir. 2011).

[20] The government's interest in preventing corruption can also encompass regulations that prevent circumvention of laws that prevent corruption (such as contribution limits) provided that the anticircumvention measure is properly tailored. *See, e.g.*, *McCutcheon*, 134 S. Ct. at 1452-53; *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001) ("*Colorado Republican II*") ("[A]ll Members of the Court agree that circumvention is a valid theory of corruption; the remaining bone of contention is evidentiary.").

the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford." *Id.* at 1441. "Ingratiation and access . . . are not corruption," *Citizens United*, 558 U.S. at 360, and "[s]pending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to . . . *quid pro quo* corruption," *McCutcheon*, 134 S. at 1450. And finally, in determining whether the government has demonstrated a legitimate interest in preventing *quid pro quo* corruption or its appearance, a court cannot "accept[] mere conjecture as adequate to carry a First Amendment burden." *Id.* at 1452.

Disclosure and organizational requirements may similarly be justified by a governmental interest in combating *quid pro quo* corruption or its appearance. *See Citizens United*, 558 U.S. at 369. But, unlike contribution and expenditure limits, the government may further defend disclosure regulations "based on a governmental interest in providing the electorate with information about the sources of election-related spending." *Id.* at 367 (internal quotation marks and alteration omitted); *see also SpeechNow*, 599 F.3d at 696.[21]

**B.**

Plaintiffs' complaint raises both facial and as-applied challenges. Therefore, before evaluating the merits of the Plaintiffs' challenges, we must be careful to properly define their scope because facial and as-applied challenges have different substantive requirements. *See, e.g., Doe v. Reed*, 561 U.S. 186, 194 (2010). Though the precise boundaries of facial and as-applied challenges are somewhat elusive—certain challenges can have characteristics

---

[21] This list is not meant to be exclusive—other sufficiently important governmental interests may also be invoked to defend the constitutionality of disclosure and organizational requirements. *See SpeechNow*, 599 F.3d at 696.

of both—to categorize a challenge as facial or as-applied we look to see whether the "claim and the relief that would follow . . . reach beyond the particular circumstances of the[] plaintiffs." *Id.* If so, regardless of how the challenge is labeled by a plaintiff, "[t]hey must therefore satisfy our standards for a facial challenge to the extent of that reach." *Id.*

We believe that Plaintiffs have properly labeled their challenges. They raise both facial and as-applied challenges to the 60-day, 500-dollar limit, the ten-contributor requirement, and the treasurer-appointment requirement. Plaintiffs raise only an as-applied challenge to the corporate contribution ban because they do not seek relief beyond the proposed in-kind contribution from TLC to TLC-IPA.

Plaintiffs have two ways to prevail in their facial challenges to the 60-day, 500-dollar limit, ten-contributor requirement, and treasurer-appointment requirement because this is a First Amendment case. First, Plaintiffs can "establish that no set of circumstances exists under which [the law] would be valid or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (internal quotation marks and citation omitted). Second, Plaintiffs may also invalidate a statute as overbroad if they demonstrate that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 473 (internal citations omitted).

With these principles in mind, we turn to the merits.

24

No. 13-50582

## V.

Plaintiffs' raise facial and as-applied challenges that the 60-day, 500-dollar limit violates the First Amendment. We hold that the 60-day, 500-dollar limit is facially unconstitutional.

## A.

The district court characterized the 60-day, 500-dollar limit as a disclosure requirement, and accordingly chose to apply "exacting scrutiny." The court examined whether there was "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." The parties dispute on appeal whether the district court applied the proper standard of review.

Plaintiffs argue that the 60-day, 500-dollar limit is a contribution and expenditure limit, and should be analyzed as such. Texas counters that the 60-day, 500-day limit is not an expenditure or contribution limit, but rather a disclosure incentive. Because a specific-purpose committee is not subject to the 60-day, 500-dollar limit, Texas suggests that the purpose of the limit is to either (1) reinforce its disclosure regulations by encouraging parties to comply with the additional disclosures necessary to form a specific-purpose committee, or (2) ensure that the public has sufficient time to learn about the goals of, and contributors to, general-purpose committees given the committees' potentially opaque nature.

To determine whether a rule is a disclosure requirement, or something more, we look to see the effect of the provision. Disclosure and disclaimer rules require the provision of information, and only incidentally prevent speech when the speaker is unwilling to provide the additional required information. *See Doe*, 561 U.S. at 196. By contrast, provisions that put a ceiling on speech even if a party is willing to provide all of the information that the government requests constitutes something more than a simple disclosure requirement.

The 60-day, 500-dollar limit places a ceiling on speech for sixty days even if a committee is willing to comply with all disclosure/disclaimer requirements applicable to general-purpose committees.  As such, the 60-day, 500-dollar limit is an expenditure and contribution limit, and the district court erred by applying only the lower level of scrutiny applicable to disclosure requirements. *Cf. Buckley*, 424 U.S. at 64 ("Unlike the overall limitations on contributions and expenditures, the disclosure requirements impose no ceiling on campaign-related activities.").

Texas's counterarguments that the 60-day, 500-dollar limit is merely a disclosure incentive do not alter that conclusion.  First, a specific-purpose committee formed less than 30 days before a primary or general election "may not knowingly make or authorize a campaign contribution or campaign expenditure supporting or opposing a candidate" for many statewide offices. Tex. Elec. Code § 253.031(c).  When specific-purpose committees are also similarly subjected to a waiting period, Texas cannot claim that all a nascent political committee must do to engage in speech is to simply provide information to the government.  Second, specific-purpose committees are fundamentally different from general-purpose committees insofar as they require fidelity to candidates rather than principles.  And though we recognize that in many circumstances candidates and causes overlap, they do not always, and Texas's fundamental requirement that committees "change [their] message" and pledge fidelity for or against particular candidates or measures, "or do not speak . . . contravenes the fundamental rule of protection under the First Amendment[] that a speaker has the autonomy to choose the content of his own message." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131

No. 13-50582

S. Ct. 2806, 2820 (2011) (internal quotation marks omitted).[22]  Third, that the 60-day, 500-dollar limit *may* help prevent circumvention of Texas's disclosure regime does not make the 60-day limit a disclosure requirement.  A complete ban on political speech would certainly prevent circumvention of Texas's disclosure regime, but no one would suggest that it is a disclosure regulation. Similarly here, the 60-day, 500-dollar limit may very well help to improve the transparency of Texas politics, but that does not make it a disclosure regulation for the purpose of determining the proper level of constitutional scrutiny.

We will analyze the 60-day, 500-dollar limit as a contribution and expenditure limit.  But that determination is only the first step of the analysis because contribution limits and expenditure limits have different standards of review, and the hybrid nature of the 60-day, 500-dollar limit means that the provision acts alternatively as a contribution limit or as an expenditure limit depending on how the general-purpose committee wishes to spend its money. Because Plaintiffs raise a facial challenge and attempt to demonstrate that the provision is unconstitutional both when it operates as an expenditure limit, and when it acts as a contribution limit, we will analyze the provision first as a cap on expenditures, and then as a cap on contributions.

**B.**

The 60-day, 500-dollar limit on political expenditures primarily affects two types of expenditures by a general-purpose committee.  First, it limits a committee's ability to engage in independent expenditures.  Second, it limits a committee's ability to engage in coordinated expenditures with a candidate.  As coordinated expenditures are constitutionally equivalent to contributions and

---

[22] *Cf. Citizens United*, 558 U.S. at 340 ("Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others.").

can be regulated as such, *see In re Cao*, 619 F.3d at 416-17, we focus here on the 60-day, 500-dollar limit's effect on independent expenditures. To withstand Plaintiffs' constitutional challenge, Texas must show that a 60-day, 500-dollar limit on independent expenditures "promotes a compelling interest and is the least restrictive means to further the articulated interest," *McCutcheon*, 134 S. Ct. at 1444. Limits on independent expenditures "usually flunk" strict scrutiny. *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 153 (7th Cir. 2011). The 60-day, 500-dollar limit similarly fails.

In the first instance, the six-month waiting period for acquiring federal multicandidate political committee status does not support Texas's claim that a 60-day limitation on *independent expenditures* is constitutional. Unlike Texas's regulations at issue here, federal law does not contain a similar limit on independent expenditures by a committee waiting to acquire multicandidate status. *See Buckley*, 424 U.S. at 51; *Cal. Med. Ass'n*, 641 F.2d at 624. The Supreme Court's approval of the federal contribution limits to a multicandidate committee at issue in *California Medical Association v. FEC*, 453 U.S. 182 (1981) ("*Cal-Med*"), accordingly does not support Texas's arguments here for limits on independent expenditures. *See Texans for Free Enterp.*, 732 F.3d at 538-39; *see also Cal-Med.*, 453 U.S. at 203 (Blackmun, J., concurring in part).

Further, when we turn to applying constitutional scrutiny, the incompatibility of Texas's position with Supreme Court precedent is clear. The Supreme Court has been unequivocal that, as a matter of law, independent expenditures do not give rise to corruption or the appearance of corruption. *Citizens United*, 558 U.S. at 357; *Texans for Free Enter.*, 732 F.3d at 537. Texas therefore cannot establish that the 60-day, 500-dollar limit directly combats

corruption.[23]  And once Texas is shorn of a direct anticorruption justification for its temporal limitation on independent expenditures, then the state lacks a constitutionally sufficient justification for limiting a general-purpose committee's independent expenditures.

Texas also cannot justify its limit on speech on the basis of its informational interest in its disclosure regime because the State's "informational interest in identifying the sources of support for" independent expenditures alone "is not enough to justify the First Amendment burden" of a limitation on independent expenditures.  *SpeechNow*, 599 F.3d at 692 (internal quotation marks omitted).[24]  And to the extent that Texas tries to link circumvention of its disclosure requirements to its anticorruption interest[25]— if such an argument is permissible at all[26]—Texas does not demonstrate proper tailoring.  Though Texas complains that its existing disclosure laws contain loopholes that may be exploited, Texas could address those loopholes by strengthening its disclosure requirements—such as by expanding mandatory electronic or fax filing requirements for disclosures—rather than by instituting

---

[23] Texas tries to substantiate its corruption concerns by reference to the "Sharpstown scandal."  The Sharpstown scandal began with the discovery of a stock manipulation scheme involving a prominent businessman and Texas politicians that quickly exploded into something much bigger after an investigation revealed that the Governor and the Speaker of the Texas House of Representatives were, in effect, bribed into pushing legislation to aid the stock fraud scheme.  *See, e.g.*, *Mutscher v. State*, 514 S.W.2d 905 (Tex. Ct. Crim. App.1974).  In the wake of the scandal, Texas passed comprehensive campaign finance reform legislation in an attempt to prevent future corruption scandals.  *See, e.g.*, *Free Market Foundation v. Reisman*, 540 F. Supp. 2d 751, 753 (W.D. Tex. 2008).  But Supreme Court precedent squarely blocks Texas's attempt to argue that independent expenditures lead to corruption.  *See, e.g.*, *Am. Tradition P'ship v. Bullock*, 132 S. Ct. 2490, 2491 (2012).

[24] *Cf. Randall v. Sorrell*, 548 U.S. 230, 244-46 (2006) (holding Vermont's expenditure limitations unconstitutional under the First Amendment).

[25] *See, e.g.*, *Stop This Insanity Inc. Emp. Leadership Fund v. FEC*, ___ F.3d ___, 2014 WL 3824225, at *5-6 (D.C. Cir. Aug. 5, 2014).

[26] Disclosure laws are generally meant to be an *alternative* to, and not necessarily a justification for, the firm limits on political speech set by expenditure limits.  *See, e.g.*, *Citizens United*, 558 U.S. at 369 ("The Court has explained that disclosure is a less restrictive alternative to more comprehensive regulations of speech.").

waiting periods on speech by newly-formed groups devoted to a particular issue or point of view. *Cf. McCutcheon*, 134 S. Ct. at 1458 ("Importantly, there are multiple alternatives available to Congress that would serve the Government's anticircumvention interest, while avoiding unnecessary abridgment of First Amendment rights." (internal quotation marks omitted)).

Moreover, when evaluating whether Texas demonstrates proper tailoring, we must evaluate whether the 60-day delay is necessary based on present circumstances—not the circumstances when the restrictions were originally passed into law. *Cf. Grutter v. Bollinger*, 539 U.S. 306, 343 (2003). Recent campaign finance decisions by the Supreme Court have emphasized the role that advancing technology plays in enabling effective and quick disclosure of campaign finance activity. As *Citizens United* explained, "[w]ith the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters." 558 U.S. at 370. Accordingly, "[b]ecause massive quantities of information can be accessed at the click of a mouse, disclosure is effective to a degree not possible at the time" section 253.037(a) was passed. *McCutcheon*, 134 S. Ct. at 1460. Thus even if the 60-day, 500-dollar limit was at some point sufficiently tailored, that is no longer true. Notwithstanding the potential opacity of general-purpose committees, it strains credulity to suggest that it takes 60 days to inform the public as to who is spending money in electoral races. *Cf. Family PAC v. McKenna*, 685 F.3d 800, 805, 812-14 (9th Cir. 2011) (rejecting argument that a 21-day contribution limit was properly tailored in light of modern technology). The lack of a demonstrated need for a 60-day limit is a significant problem for Texas: "[i]n the First Amendment context, fit matters," *McCutcheon*, 134 S. Ct. at 1456, and Texas's choice to enact a 60-day speech

No. 13-50582

limit is badly "asymmetrical" to its interest in preventing *quid pro quo* corruption, *Citizens United*, 558 U.S. at 361.

Texas's two main counterarguments that the 60-day, 500-dollar limit is properly tailored do not alter that conclusion. First, Texas argues that the provision is narrowly tailored because interested speakers have many other opportunities for speaking during the 60-day period, and as such, the 60-day, 500-dollar limit does not prevent any citizen from speaking.[27] But Texas's

---

[27] Texas points us to *Regan v. Taxation With Representation*, 461 U.S. 540 (1983), to argue that the 501(c) organizations (TLC and SAFA) related to two of the general-purposes committees (TLC-IPA and FOFSA) "cannot turn around and use the First Amendment to demand government subsidies for their speech," when the organizations earn government subsidies in the form of tax exemptions.

*Regan* has little to do with this case. *Regan* dealt with "the requirement that a nonprofit corporation establish a separate lobbying entity if contributions to the corporation for the conduct of other activities were to be tax-deductible." *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 256 n.9 (1986) (opinion of Brennan, J.). But here the general-purpose committee plaintiffs are separate entities, and those committees have their own First Amendment rights to engage in political speech. None of the cases that Texas cites stands for the proposition that the political committees' rights to engage in political speech are somehow altered by the fact that individuals working for a 501(c) organization had the idea to form the general-purpose committees. To the contrary, in fact: the Supreme Court has regularly reminded the lower courts that organizations such as political committees and corporations have First Amendment rights to engage in political speech. *See, e.g.*, *Citizens United*, 558 U.S. at 343; *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 494 (1985). Further, here Texas *is* "plac[ing] obstacles in the path" of individuals' and organizations' exercise of their First Amendment rights. *Regan*, 461 U.S. at 549. Texas defines a political committee to be "a group of persons that has as a principal purpose accepting political contributions or making political expenditures," Tex. Elec. Code § 251.001(12), and the Texas Ethics Commission has interpreted that definition to include "a group of two or more people that accepts political contributions and/or makes political expenditures," Texas Ethics Comm'n, *supra* note 3, at 1. As such, unlike the situation at issue in *Regan* where groups had the choice of applying for 501(c)(3) status, Texas does not make the political committee label voluntary—groups wishing to engage in collective political speech *must* comply with the burdens imposed by Texas law. And, "[i]t is rudimentary that the State cannot exact as the price" of the desire simply to participate in political activities as a group without supporting a particular candidate or measure, "the forfeiture of First Amendment rights." *Citizens United*, 558 U.S. at 351 (internal quotation marks omitted).

Texas's additional suggestion that simply because they grant general-purpose committees some special privileges vis-à-vis other types of political committees, the state may regulate general-purpose committees as it pleases does no better. Just as the *Citizens United* and *Bellotti* Courts rejected the argument that simply because the state grants special privileges to corporations the state can regulate corporate speech as it pleases, *see Citizens*

argument runs contrary to both Supreme Court and circuit precedent. *See, e.g.*, *Citizens United* 558 U.S. at 337-38 (noting that federal law enacted "a ban on corporate speech notwithstanding the fact that a PAC created by a corporation can still speak"); *Texans for Free Enter.*, 732 F.3d at 539. Just as we do not permit the government to silence the *New York Times* because the reporters could shout-out their stories in Central Park or publish them on the internet, we do not permit the government to silence various political organizations simply because their component parts have other opportunities for speech. Texas's limitations on general-purpose committees must rise and fall on their own merits.[28]

---

*United*, 558 U.S. 342-43; *id.* at 351; *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 779-86 (1978), we reject Texas's argument that because it grants special privileges to certain types of political committees, it may regulate the committees as it pleases. Notwithstanding Texas's choice to grant certain privileges to certain types of committees, any restrictions on those committees' political speech—particularly given the expansive definition of what constitutes a political committee under Texas law—must still withstand constitutional scrutiny under the appropriate test for the restriction at issue.

[28] We are aware that in *Stop This Insanity* the D.C. Circuit considered the availability of other avenues in speech when determining whether a regulation on *corporate* political speech was permissible. *See* 2014 WL 3824225, at *3. Whatever the merits of the approach in *Stop This Insanity*, it would not change the result here because there are fundamental differences between federal law's regulation of separate segregated funds and Texas's regulation of general-purpose committees.

As noted by the D.C. Circuit, under federal campaign finance law, separate segregated funds are essentially the appendix of federal campaign finance law—a vestigial surplusage no longer necessary and/or needed for corporations to engage in independent expenditures. *Id.* at *3-4.

But the same is not true for general-purpose committees in Texas. Under Texas law any group that engages in more than $500 of expenditures or contributions, and supports "a particular issue or point of view," should register as a general-purpose committee, even if it chooses in a particular instance to "lend[] support to a particular candidate in an election." Tex. Ethics Comm'n, *supra* note 3, at 2. As such, beyond perhaps the basic choice to participate in political activities as a group without wishing to declare fidelity to a candidate—which we refuse to consider "the hard way" of exercising First Amendment rights—the choice to form a general-purpose committee is in no way voluntary. Accordingly, even under the framework suggested by *Stop This Insanity*, Texas's 60-day, 500-dollar limit and ten-contributor requirements create significant constitutional concerns because speakers supporting a cause (rather than a candidate) in Texas are presented with "a choice between

Second, Texas suggests that the provision is narrowly tailored because general-purpose committees can pick when the 60-day period runs. But we think Texas's suggestion overlooks the practical reality that oftentimes few observers know the critical issues in an election (and the candidates' position on those issues) until just days before. *See, e.g.*, *WRTL II*, 551 U.S. at 462 (plurality) ("But groups . . . cannot predict what issues will be matters of public concern . . . . In these cases, WRTL had no way of knowing well in advance that it would want to run ads on judicial filibusters . . . .").[29] After all, October Surprises are not called October Surprises because they happen in June. In such situations, "timing is of the essence . . . when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring). Accordingly, the 60-day limit "places a severe burden on speech because it may even preclude expression necessary to provide an immediate response to late-breaking events." *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1009 (9th Cir. 2003) (internal quotation marks omitted).[30] We reject Texas's suggestion that the 60-day burden does not constitute a significant

---

'unfettered political speech and subjection to discriminatory fundraising limitations.'" *Stop This Insanity*, 2014 WL 3824225, at *4 (quoting *Davis v. FEC*, 554 U.S. 724, 739 (2008)).

[29] As the Supreme Court observed in *Citizens United*:

It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held. There are short timeframes in which speech can have influence. The need or relevance of the speech will often first be apparent at this stage in the campaign. The decision to speak is made in the heat of political campaigns, when speakers react to messages conveyed by others.

558 U.S. at 334; *see also N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[T]he value of political speech is at its zenith at election time.").

[30] *See also Ariz. Right to Life PAC*, 320 F.3d at 1008 ("To suggest that the waiting period is minimal ignores the reality of breakneck political campaigning and the importance of getting the message out in a timely, or, in some cases, even instantaneous fashion."); *cf. Family PAC v. McKenna*, 685 F.3d 800, 812-13 (9th Cir. 2011) (noting contribution ban in the three weeks before an election constituted a significant burden on speech).

restriction on speech because a general-purpose committee will know when it will be severely limited in its speech.

We therefore conclude that the 60-day, 500-dollar limit is unconstitutional insofar as it limits a general-purpose committee, such as TLC-IPA, to funding only $500 in independent expenditures.

## C.

Next we address the 60-day, 500-dollar limit as it affects a general-purpose committee's ability to fund contributions. Texas must show that the contribution limitations serve "a sufficiently important interest and employ[] means closely drawn." *Buckley*, 424 U.S. at 25. And, just as with expenditure limitations, "the sole governmental interest . . . recognized as a justification for restricting contributions [is] the prevention of quid pro quo corruption." *Let's Help Fla. v. McCrary*, 621 F.2d 195, 199 (5th Cir. 1980). The Supreme Court's recent decision in *McCutcheon* dictates the result here.

In *McCutcheon*, the Supreme Court dealt with the constitutionality of an aggregate contribution cap that limited the total amount that an individual could donate to all candidates, parties, and committees (and not the base contribution limit that could be donated to any one particular candidate, committee, or party). The Supreme Court found the aggregate limits unconstitutional because they did "little, if anything" to combat corruption, "while seriously restricting participation in the democratic process." *McCutcheon*, 134 S. Ct. at 1442. As the Court noted,

> The difficulty is that once the aggregate limits kick in, they ban all contributions of *any* amount. But Congress's selection of a $5,200 base limit indicates its belief that contributions of that amount or less do not create a cognizable risk of corruption. If there is no corruption concern in giving nine candidates up to $5,200 each, it is difficult to understand how a tenth candidate can be regarded as corruptible if given $1,801, and all others corruptible if given a dime. And if there is no risk that additional candidates will be

corrupted by donations of up to $5,200, then the Government must defend the aggregate limits by demonstrating that they prevent circumvention of the base limits.

The problem is that they do not serve that function in any meaningful way.

*Id.* at 1452.

Similarly here, Texas's enshrinement of the 60-day, 500-dollar limit demonstrates the Texas Legislature's belief that a $500 donation to any particular candidate does not pose a risk of corruption even if public knowledge of the source of the contribution is complicated by the proximity of the contribution to the committee's formation. But if a single $500 contribution does not risk corruption, it is hard to see how three $167 contributions hold out such a significant risk of corruption that the former is permitted and the latter is not. And even more to the point, as the aggregate contributions limit is also reduced by independent expenditures, it is particularly hard to see how a $500 contribution to a candidate by a newly-formed general-purpose committee does not create a cognizable risk of corruption, but a $15 contribution by a newly-formed committee that had engaged in $490 of independent expenditures does. The logic undergirding *McCutcheon* stands out as deeply problematic for Texas's attempts to justify its aggregate contributions cap—particularly as *Cal-Med*, Texas's best authority in favor of a 60-day cap, deals primarily with base limits and not an aggregate contributions cap. *See* 2 U.S.C. § 441a(1)-(2); *see also McCutcheon*, 134 S. Ct. at 1442 n.3.

Texas must therefore try to justify the provision as an anticircumvention measure. But we do not believe Texas can justify the 60-day, 500-dollar limit on contributions as a measure to prevent circumvention of the contribution limits on specific-performance committees during legislative sessions and judicial elections. Tex. Elec. Code §§ 253.034(a), .153(a). In the first instance,

an ever-present 60-day, 500-dollar limitation that kicks in regardless of the proximity of the committee's formation to a legislative session or a judicial election is vastly overbroad to the circumvention threat it is trying to combat. *Cf. McCutcheon*, 134 S. Ct. at 1458 ("[T]he indiscriminate ban on all contributions above the aggregate limits is disproportionate to the Government's interest in preventing circumvention."); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 793 (1978) (noting that the government's interest "is belied . . . by the provisions of the statute, which are both underinclusive and overinclusive"). But more importantly, Texas would still be unable to justify an *aggregate* limit—as opposed to per-candidate, per-committee, and per-party base limits—under the logic of *McCutcheon.*

Texas's further attempts to distinguish *McCutcheon* based on Texas's interest in preventing circumvention of its disclosure requirements do not establish that Texas's efforts are properly tailored. Even though the aggregate limit at issue here is only temporary, and, after the 60-day window passes, the general-purpose committee is largely free to spend as it pleases, Texas must still show that the 60-day, 500-dollar limit "employs means closely drawn." But Texas does not provide any evidence supporting a *60-day* aggregate contribution cap as necessary. *See, e.g.*, *Family PAC*, 685 F.3d at 812-14 (rejecting argument that a 21-day contribution limit was closely tailored in light of modern technology); *see also McCutcheon*, 134 S. Ct. at 1460 (noting role that advancing technology plays in enabling prompt disclosure); *Citizens United*, 558 U.S. at 369-70 (same).

Texas also raises the argument that because a general-purpose committee could reform as a specific-purpose committee, and engage in speech, the 60-day, 500-dollar limit is supposedly no limit at all. But this argument does no better in the context of distinguishing *McCutcheon* than it does in supporting a 60-day, 500-dollar limit on independent expenditures. First,

under binding precedent, the availability of other avenues of speech does not excuse the imposition of an unconstitutional burden on organizations wanting to engage in speech. *See, e.g.*, *Citizens United*, 558 U.S. at 337-38; *Texans for Free Enter.*, 732 F.3d at 539. Second, even if we could consider such alternatives, Texas's choice to force general-purpose committees to pledge fidelity to candidates rather than principles, as well as Texas Election Code § 253.031(c)'s prohibition on expenditures or contributions by a specific-performance committee formed less than 30 days before an election, mean that a specific-performance committee is not a true constitutional substitute for speech by general-purpose committees. *See Ariz. Free Enter.*, 131 S. Ct. at 2820.

We conclude that the 60-day, 500-dollar limit is unconstitutional insofar as it acts as an aggregate $500 contribution limit on newly-formed general-purpose committees wishing to engage in political contributions such as it did on Plaintiffs FOFSA and Texas Freedom.

### D.

To show that the 60-day, 500-dollar limit is facially unconstitutional, Plaintiffs need to demonstrate either that (1) no set of circumstances exist under which 60-day, 500-dollar limit is valid, or (2) a substantial number of the 60-day, 500-dollar limit's applications are unconstitutional, when judged in relation to the limit's plainly legitimate sweep. Plaintiffs make that showing.

Plaintiffs have demonstrated that the 60-day, 500-dollar limit is unconstitutional both when it functions as a limitation on expenditures and when it functions as an aggregate contributions cap. As such, the 60-day limit appears to have *no* legitimate sweep (or at the very least is vastly overbroad). Nor is this a situation where we can rewrite Texas law to conform to constitutional requirements. *See generally Ayotte v. Planned Parenthood of N.*

*New England*, 546 U.S. 320, 328-31 (2006). Either trying to shorten Texas's 60-day period into something much more compact, or trying to transform Texas's aggregate contribution cap into a per-candidate contribution cap (and determine what that cap should be) would constitute "quintessentially legislative work." *Id.* at 329. It is not our job to determine the maximum possible imposition on speech that Texas may enact, and save Texas's statute by re-writing it contrary to its plain text so that it embodies the maximum constitutionally permissible limit on speech. Here Texas plainly intended to enact a 60-day aggregate expenditure and contributions cap, and we have determined that such a limit is unconstitutional. Therefore, the "ongoing chill upon speech that is beyond all doubt protected makes it necessary to invoke the earlier precedents that a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated." *Citizens United*, 558 U.S. at 336. We REVERSE the district court's grant of summary judgment that the 60-day, 500-dollar limit is constitutional, and RENDER summary judgment for the Plaintiffs that the 60-day limit created by Texas Election Code § 253.037(a)(1) is facially unconstitutional under the First Amendment.

## VI.

Next we address the facial and as-applied challenges to the ten-contributor requirement. Texas requires that a general-purpose committee have ten unique contributors before exceeding $500 in contributions or expenditures. Tex. Elec. Code § 253.037(a)(2). Plaintiffs raise two constitutional objections to the ten-contributor requirement. First, Plaintiffs argue that the ten-contributor requirement represents an unconstitutional expenditure and contribution limit under *Buckley*. Second, Plaintiffs argue that the ten-contributor requirement unconstitutionally abridges their

freedom of association because it forces them to associate with ten other contributors.

We hold that the ten-contributor requirement is a facially unconstitutional expenditure and contribution limit under *Buckley*. We therefore do not address Plaintiffs' arguments that the ten-contributor requirement forces association.

## A.

In analyzing Plaintiffs' *Buckley* challenge to the ten-contributor requirement, the district court determined that the ten-contributor requirement was a disclosure requirement, and applied the level of scrutiny applicable to disclosure requirements. Under that level of scrutiny, the district court determined that the ten-contributor requirement survived constitutional scrutiny because it "ensures the committee is actually a committee and not merely an individual seeking to disguise his or her personal contributions."

Plaintiffs argue on appeal that the district court should have analyzed the ten-contributor requirement under the heightened levels of scrutiny applicable to expenditure and contribution limits. Texas counters that the district court properly analyzed the provision as a disclosure requirement because the point of the ten-contributor requirement is to provide the electorate with information—that is to ensure that parties representing themselves as groups actually are groups.

We agree with the Plaintiffs that the ten-contributor requirement is a contribution and expenditure limit. Unlike disclosure and organizational requirements, under which compliance is within the committee's own control and the only limit on speech arises if a committee is not willing to comply with the burdens imposed by the law, the ten-contributor requirement prevents a general-purpose committee from exceeding $500 in expenditures and

No. 13-50582

contributions until the committee can persuade ten donors to contribute.[31]  *Cf.* *Citizens United*, 558 U.S. at 366 (differentiating appropriate level of scrutiny on provisions that burden the ability to speak and provisions that impose external ceilings on speech).  Because compliance with the ten-contributor requirement is not within the committee's own control, and until a committee is able to comply with the requirement there is a firm ceiling on the committee's speech, we conclude the provision is a contribution and expenditure limit and should be analyzed as such.  That the ten-contributor requirement also has the effect of improving the quality of disclosure in Texas does not alter the fact that the provision achieves that goal by limiting expenditures and contributions.

Therefore, we analyze the ten-contributor requirement first as a limit on expenditures, and then as a limit on contributions.

**B.**

As with the 60-day, 500-dollar limit, we primarily consider the effect of the ten-contributor requirement on independent expenditures when determining whether the ten-contributor requirement unconstitutionally burdens expenditures.  To determine the constitutionality of the ten-contributor requirement's limitation on independent expenditures, we see whether the requirement "promotes a compelling interest and is the least restrictive means to further the articulated interest." *McCutcheon*, 134 S. Ct. at 1444.

---

[31] The ten-contributor requirement is *not* an organizational requirement that a general-purpose committee must have ten members.  *See, e.g.*, Tex. Elec. Code § 251.001(12), (14).  For example, five people are fully capable of forming a general-purpose committee.  *See* Tex. Ethics Comm'n, *supra* note 3, at 1 ("[A] political committee is a group of two or more people that accepts political contributions and/or makes political expenditures.").  Those five people must just wait to receive contributions from ten contributors before exceeding $500 in contributions and expenditures.

Texas cannot show the ten-contributor requirement directly combats corruption because independent expenditures do not give rise to corruption or the appearance of corruption. *Am. Tradition P'ship*, 132 S. Ct. at 2491; *Citizens United*, 558 U.S. at 357; *Texans for Free Enter.*, 732 F.3d at 537. Accordingly, Texas is forced to try to defend the ten-contributor requirement on the basis that it supports Texas's disclosure requirements. But that argument does no better. Insofar as Texas tries to link circumvention of its disclosure requirements to its anticorruption interest—assuming, without deciding, that such an argument is permissible—Texas fails to demonstrate proper tailoring on this record: the ten-contributor requirement is not the "least restrictive means to further" Texas's "articulated interest," *McCutcheon*, 134 S. Ct. at 1444—more demanding disclosure and disclaimer requirements are. Insofar as Texas tries to link its disclosure requirements to the public's informational interest in knowing who is spending money in elections, that interest "is not enough to justify the First Amendment burden" of a hard limit on speech. *SpeechNow.org*, 599 F.3d at 692.[32]

Texas neither shows that the ten-contributor requirement promotes a compelling interest or is properly tailored. We determine that the ten-contributor requirement unconstitutionally limits First Amendment rights insofar as it caps a newly-formed general-purpose committee at $500 worth of independent expenditures until the committee acquires ten contributors.

**C.**

To determine whether the ten-contributor requirement is constitutional as a contribution limit, we examine whether Texas "demonstrates a sufficiently

---

[32] The fifty-contributor requirement for federal multicandidate status lends Texas no support on this point because federal law does not limit a committee's independent expenditures during the waiting period. *See Texans for Free Enterp.*, 732 F.3d at 538-39; *see also Cal-Med.*, 453 U.S. at 203 (Blackmun, J., concurring in part).

No. 13-50582

important interest and employs means closely drawn." *McCutcheon*, 134 S. Ct. at 1444.

*McCutcheon* leads us to reject Texas's defense of the ten-contributor requirement as a contribution limit.[33] Texas does not show that its aggregate contribution cap directly advances the state's interest in combatting *quid pro quo* corruption "in any meaningful way." *Id.* at 1452. Nor is the provision a sufficiently tailored anticircumvention measure. Texas advances no reason why more narrowly tailored base contribution limits until a committee acquired ten contributors would not similarly serve its interests. *Cf. McCutcheon*, 134 S. Ct. at 1458. And even if Texas could demonstrate that per-candidate, per-committee, and per-party base limits would not sufficiently prevent circumvention, § 253.037(a)'s aggregate contribution cap would still be poorly tailored to Texas's limited anticircumvention interest insofar as it also caps general-purpose committees from contributing to ballot-measure committees, which do not give rise to *quid pro quo* corruption or its appearance. *See, e.g.*, *Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley*, 454 U.S. 290, 299-300 (1981); *see also Bellotti*, 435 U.S. at 790-91.

We conclude that the ten-contributor requirement does not withstand constitutional scrutiny as a contribution limit.

**D.**

Because the ten-contributor requirement is unconstitutional both insofar as it constitutes a $500 cap on independent expenditures and insofar as it constitutes a $500 aggregate contribution cap, we conclude that the ten-contributor requirement has no legitimate sweep (or, at the very least, is vastly

---

[33] The fifty-contributor requirement for federal multicandidate committee status does not support Texas's argument in favor of an *aggregate* limit because "PACs that do not qualify as multicandidate PACs must abide by the *base* limit[s] applicable to individual contributions." *McCutcheon*, 134 S. Ct. at 1442 n.3 (emphasis added).

No. 13-50582

overbroad in relation to any legitimate sweep it has). And, as with the 60-day, 500-dollar limit, we do not believe that we can rewrite the ten-contributor requirement to conform to constitutional requirements because doing so would constitute "quintessentially legislative work," *Ayotte*, 546 U.S. at 329, against the clear intent of the Texas Legislature. We REVERSE the district court's grant of summary judgment that the ten-contributor requirement is constitutional, and RENDER summary judgment for the Plaintiffs that the ten-contributor requirement set out by Texas Election Code § 253.037(a)(2) is facially unconstitutional under the First Amendment.

## VII.

We turn to Plaintiffs' argument that Texas's treasurer-appointment requirement represents an unconstitutional prior restraint. We conclude the treasurer-appointment requirement withstands constitutional scrutiny.

### A.

Though prior restraints have long been constitutionally suspect,[34] the precise boundaries of the constitutional prohibitions on prior restraints are not well defined.[35] The classic prior restraint, of course, is an "administrative [or] judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (internal quotation marks and alterations omitted);

---

[34] 3 Joseph Story, *Commentaries on the Constitution of the United States*, § 1874, at 732 (Boston, Hilliard, Gray, & Co. 1833) ("It is plain, then, that the language of this amendment imports no more, than that every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without any prior restraint . . . ."); *see also Patterson v. Colorado*, 205 U.S. 454, 462 (1907) (noting the "main purpose" of the First Amendment was to prevent prior restraints).

[35] "The phrase 'prior restraint'," the Supreme Court has explained, is neither "a self-wielding sword" nor "a talismanic test." *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441 (1957).

*see, e.g., Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931). But concerns about prior restraints have also resulted in the invalidation of speech licensing schemes that give the licensor too much discretion in how to exercise his authority. *See, e.g., Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988); *Cantwell v. Connecticut*, 310 U.S. 296, 305-07 (1940). And beyond licensing schemes where officials have discretion, the Court has also called into question regulations that require registration before certain types of speech. *See, e.g., Watchtower Bible & Tract Society of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 164-69 (2002); *Thomas v. Collins*, 323 U.S. 516, 525 (1945).

Under Texas law, a general-purpose committee may not accept political contributions in excess of $500 or engage in more than $500 in aggregate expenditures and contributions until, among other things, a committee-treasurer has been appointed (the "treasurer-appointment" requirement). *See, e.g.*, Tex. Ethics Comm'n, Ethics Advisory Op. No. 161 (1993); *see also* Tex. Elec. Code §§ 253.031(b), .037(a). Plaintiffs argue that the treasurer-appointment requirement falls into the latter category of impermissible pre-registration requirements. But the treasurer-appointment requirement differs from the permitting regimes in *Village of Stratton* and *Thomas* in at least one important regard. Both *Village of Stratton* and *Thomas* dealt with registration requirements that took effect before any speech had occurred. *See, e.g., Vill. of Stratton*, 536 US. at 165-66 ("It is offensive . . . to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so."); *Thomas*, 323 U.S. at 540. In contrast, the treasurer-appointment requirement does not similarly regulate speech. Not only are individuals in Texas entirely free to engage in whatever political speech they wish, but also a group of citizens interested in forming a general-purpose committee need only register and appoint a campaign treasurer before political

contributions or expenditures exceed $500. *See* Tex. Ethics Comm'n, Ethics Advisory Op. No. 161 (1993); *see also* Tex. Elec. Code § 253.031(b). As such, many of the limitations on spontaneous speech that the Court has found constitutionally repugnant in *Village of Stratton* simply are not present here— no one has to comply with the treasurer-appointment requirement to give a speech or pass out a simple handbill to their neighbors.

However, just as Texas's treasurer-appointment requirement is different from the pre-registration requirements rejected in *Village of Stratton* and *Thomas*, it is also different from some other committee-treasurer requirements insofar as it requires registration *before* exceeding a certain amount of political spending rather than a certain number of days after exceeding a certain amount of political spending. Federal law, for example, presently requires a political committee to register no later than ten days after engaging in more than $1000 of expenditures or receiving more than $1000 of contributions. *See, e.g.*, 2 U.S.C. § 433(a); 11 C.F.R. § 102.1(d). Because Texas's reporting requirements are different from the federal requirements, *Buckley*'s approval[36] of the federal reporting requirements does not dictate the result here, and we have to scrutinize the treasurer-appointment requirement to determine whether it passes constitutional scrutiny. *See Vill. of Stratton*, 536 U.S. at 165.

**B.**

Neither party offers much suggestion as to what level of scrutiny should be applied to analyze the treasurer-appointment requirement. To be sure, the Supreme Court has observed that "[a]ny system of prior restraints of expression bears a heavy presumption against its constitutional validity." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971). But that is not a standard of review, and judicial decisions analyzing prior restraints have applied

---

[36] *See* 424 U.S. at 81-82.

different standards of review depending on the restraint at issue. *See, e.g.*, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984); *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) ("We note initially that the [plaintiff] is simply wrong in arguing that all prior restraints on speech are analyzed under the same test."). And, most importantly, neither *Village of Stratton* nor *Thomas* explained the proper constitutional test for analyzing registration requirements. *See Vill. of Stratton*, 536 U.S. at 164. The *Village of Stratton* Court found it "unnecessary" to determine the standard of review "because the breadth of speech affected by the ordinance and the nature of the regulation make it clear that the Court of Appeals erred in upholding it." *Id.*[37] Because the treasurer-appointment requirement does not sweep as broadly as the restriction in *Village of Stratton*, however, we do not believe we can similarly refrain from deciding the issue of the proper standard of review.

In the absence of more specific guidance, we analyze the treasurer-appointment requirement as a disclosure and/or organizational requirement. We arrive at that result for two reasons.

First, and foremost, the treasurer-appointment requirement *is* a disclosure requirement: all that the provision requires is that a general-purpose committee take simple steps to formalize its organizational structure and divulge additional information to the government.[38] And unlike (1) the 60-day, 500-dollar limit, (2) the ten-contributor requirement, and (3) other temporal and monetary limitations on contributions and expenditures, general-purpose committees remain fully in control of their compliance with

---

[37] The *Village of Stratton* Court ended up looking "to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve." 536 U.S. at 165.

[38] *See also* Jack M. Raines et al, *The Texas Election Code and the 70th Legislature*, 40 Baylor L. Rev. 1, 31 (1988) (characterizing the $500 registration threshold as a disclosure requirement).

the treasurer-appointment requirement.    No external factor limits the Committee's ability to speak: the committee does not have to wait for sixty days (or an election cycle) to pass, or persuade ten contributors to contribute. Accordingly, a lower level of scrutiny is appropriate because any limit on speech created by the requirement arises solely from the committee's own choice to not provide information to the government. *Cf. Citizens United*, 558 U.S. at 366 (differentiating appropriate level of scrutiny on provisions that burden the ability to speak and provisions that impose external ceilings on speech); *The Real Truth About Abortion, Inc.*, 681 F.3d at 548-49 (same).

Second, to the extent we still have concerns regarding prior restraints in the campaign-finance context, those concerns can be addressed through the existing constitutional test for disclosure requirements. *Cf. McCutcheon*, 134 S. Ct. at 1450 (noting that the "established First Amendment analysis already takes account of any 'collective' interest that may justify restrictions on individual speech").    Our scrutiny of disclosure and/or organizational requirements is not a rubber stamp, *see, e.g.*, *Davis v. FEC*, 554 U.S. 724, 744 (2008), and Texas will have to persuasively defend a registration requirement that requires disclosure of the treasurer before a general-purpose committee exceeds $500 in order to demonstrate that the law is appropriately tailored. We see no need to create a bespoke level of scrutiny for the analysis of the treasurer-appointment requirement when our existing test can adequately account for the nuances of the Plaintiffs' challenge.[39]

---

[39] *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (Ginsburg, J., concurring) (noting that the Court was "leaving open matters not presented by McIntyre's handbills").

No. 13-50582

## C.

Plaintiffs concede that Texas has a sufficiently important interest to justify the constitutionality of the treasurer-appointment requirement. As the D.C. Circuit explained in *SpeechNow*:

> [T]he public has an interest in knowing who is speaking about a candidate and who is funding that speech, no matter whether the contributions were made toward administrative expenses or independent expenditures. Further, requiring disclosure of such information deters and helps expose violations of other campaign finance restrictions such as those barring contributions from foreign corporations or individuals. These are sufficiently important governmental interests to justify requiring [the Plaintiffs] to organize and report . . . as a political committee.

599 F.3d at 698; *see also Buckley*, 424 U.S. at 66-68; *Vt. Right to Life Comm.*, 2014 WL 2958565, at *11; *Ctr. for Individual Freedom*, 697 F.3d at 477-78; *Nat'l Org. for Marriage*, 649 F.3d at 57-58; *Human Life of Wash. Inc.*, 624 F.3d at 1006.

Accordingly, we deal here with a dispute between the parties as to whether the treasurer-appointment requirement is properly tailored. To determine this, we look to see whether there is "a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed." *Davis*, 554 U.S. at 744 (internal quotation marks omitted).

Plaintiffs claim the treasurer-appointment requirement fails tailoring analysis because Texas could lessen the burden of the treasurer-appointment requirement by requiring registration after a general-purpose committee has exceeded a certain level of spending. Texas meanwhile defends the provision as properly tailored given the State's interest in promoting disclosure and ensuring compliance with state campaign finance laws.

48

No. 13-50582

We conclude that the treasurer-appointment requirement withstands constitutional scrutiny.    First, any burden created by the treasurer-appointment requirement—essentially filling out and putting a three-page form that asks for basic information in the mail[40]—appears to be exceedingly minimal.  *See, e.g.*, *SpeechNow*, 599 F.3d at 697 ("Nor do the organizational requirements that [plaintiff] protests, such as designating a treasurer . . . impose much of an additional burden . . . .").[41]   None of the Plaintiffs, for example, explain how the treasurer-appointment requirement (as opposed to the 60-day limit) actually burdened or impacted—in any way—their ability to form a general-purpose group to speak on their behalf. And without a persuasive explanation as to why the treasurer-appointment requirement constitutes a burden, Plaintiffs' constitutional challenge faces an uphill battle. *Cf. Citizens United*, 558 U.S. at 337-39 (noting the "onerous restrictions" on political committees imposed by federal law that political committees must comply with "just to speak").

---

[40] *See* Tex. Ethics Comm'n, Form GTA (Sept. 1, 2003 Rev.), *available at* http://www.ethics.state.tx.us/forms/gta.pdf.  As the Plaintiffs' complaint notes, the notice is effective when postmarked.  *See* Tex. Elec. Code § 251.007; *see also* Raines et al, *supra* note 38, at 20 (former Texas Secretary of State explaining Texas's timing rules on campaign treasurer appointments).  And should it be a weekend or a holiday when a postmark may not be immediately available, *see, e.g.*, *Village of Stratton*, 536 U.S. at 167-68 (noting that ordinance prevented spontaneous speech on holidays and weekends), the Texas Election Code mailbox rule also accepts filings as timely "if the person required to take the action furnishes satisfactory proof that it was deposited in the mail or with a common or contract carrier within the period or before the deadline."  Tex. Elec. Code § 251.007.

[41] *See also Worley*, 717 F.3d at 1250 (noting minimal burden imposed by similar requirements); *Iowa Right to Life Comm. v. Tooker*, 717 F.3d 576, 593-96 (8th Cir. 2013) (noting minimal burden created by short paperwork requirement).  Our analysis of Texas's requirement also takes into account that improving technology is a two-way street for the parties.    Just as technological improvements are relevant to the tailoring analysis of contribution and expenditure limits insofar as they permit the more rapid disbursement of information, we also believe that technological improvements are relevant to the analysis of the burden of disclosure requirements insofar as they lessen the difficulty of tracking, compiling, and disclosing the information that a state requests.

No. 13-50582

When set against that burden, the treasurer-appointment requirement more than justifies its existence. The treasurer serves as the cornerstone of Texas's entire general-purpose committee campaign-finance disclosure regime. *See, e.g.*, Tex. Elec. Code §§ 254.153, .154, .1541, .155, .159, .160, .161. Thus Texas's requirement that committees appoint a committee treasurer bears a substantial relationship to its informational interest in ensuring the smooth functioning of its campaign finance disclosure scheme. And Texas's justification for a registration requirement that kicks in before a committee reaches a certain level of activity rather than after is all the more persuasive in light of today's result. *See, e.g.*, Senate Comm. on Elections, Bill Analysis, Tex. S.B. 1068, 69th Leg. R.S., at 1 (1985) (noting problems Texas was having with the "[l]ast minute formation of general-purpose political committees for the purpose of avoiding filing requirements"). Striking down Texas's 60-day waiting period, thereby deepening Texas's reliance on prompt and full compliance with its disclosure requirements in order to deter and detect corruption, but then undercutting Texas's disclosure regime by forcing Texas to wait further to receive information from active general-purpose committees, would amount to little more than a judicial bait-and-switch. *Cf. Ctr. For Individual Freedom*, 697 F.3d at 490 ("The need for an effective and comprehensive disclosure system is especially valuable after *Citizens United . . . .*"). This court is not blind to the fact that Texas's disclosure scheme, given Texas's near-total aversion to spending limits, plays a relatively more important role in preventing corruption or its appearance in Texas than in many other states, and we refuse to (1) force Texas to simultaneously rely more on its disclosure scheme, but then (2) further complicate Texas's efforts to make it effective.

Had Texas required registration before a general-purpose committee engaged in any political activity, this would be a vastly different case given

50

*Village of Stratton* and *Thomas*. But Texas has excerpted small-scale general-purpose committee political activity from its registration requirements,[42] and we are unwilling to say, particularly given this record, that the Constitution requires Texas to wait further before demanding to know who on the committee is responsible for the committee's compliance with Texas's disclosure regime. We AFFIRM the district court's determination that Texas Election Code § 253.037(a)(1)'s treasurer-appointment requirement is constitutional both facially and as-applied to these plaintiffs.

## VIII.

Finally, we address Texas Leadership Coalition's and the Texas Leadership Coalition-Institute for Public Advocacy's narrow as-applied challenge to Texas's ban on corporate contributions to political committees. *See* Tex. Elec. Code § 253.094(a). The two entities ask us to determine that it is unconstitutional for Texas to bar TLC from making an in-kind donation of an email mailing list to TLC-IPA. Plaintiffs promise that the email contact list will be used only for distributing independent expenditure-funded advertisements.

Plaintiffs' challenge comes at a time that the federal courts are reevaluating the limits on corporate spending in politics. In *Citizens United*, the Supreme Court ruled that a federal ban on independent expenditures by corporations is unconstitutional under the First Amendment. 558 U.S. at 365-66. And then in *Texans for Free Enterprise* this court followed a growing judicial consensus among the circuit courts that limits on corporate

---

[42] *See* Tex. Ethics Comm'n, Ethics Advisory Op. No. 161 (1993); *see also* Tex. Elec. Code § 253.031(b).

contributions to independent-expenditure-only committees are likewise unconstitutional. 732 F.3d at 537-38.[43]

Contributions earmarked solely for use in independent expenditures by "hybrid" political committees that engage in both independent expenditures and direct contributions to candidates appears destined to be a coming campaign-finance law battleground.[44] The district court, following a line of precedent holding that merely requiring separate hard and soft money accounts is not enough to prevent *quid pro quo* corruption or its appearance in the context of hybrid PACs,[45] held that Texas could ban corporate contributions to hybrid PACs. The district court further noted that because the contribution at issue in this as-applied challenge was "information rather than funds" the state's corruption concern was further strengthened "because information cannot be segregated in a separate account." We agree with the district court that Texas may constitutionally regulate the contemplated in-kind

---

[43] *See, e.g.*, *Republican Party of N.M. v. King*, 741 F.3d 1089, 1103 (10th Cir. 2013); *N.Y. Progress & Protection PAC*, 733 F.3d at 488; *Wis. Right to Life State Political Action Comm.*, 664 F.3d at 143; *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 696 (9th Cir. 2010); *SpeechNow*, 599 F.3d at 694-95.

[44] *See, e.g.*, *Vt. Right to Life Comm., Inc.*, 2014 WL 2958565, at *18-19 ("A separate bank account may be relevant, but it does not prevent *coordinated* expenditures—whereby funds are spent in coordination with the candidate."); *Republican Party of N.M.*, 741 F.3d at 1097-98 ("[N]o anti-corruption interest is furthered as long as the [hybrid committee] maintains an account segregated from its candidate contributions."); *Ala. Democratic Conference v. Broussard*, 541 F. App'x 931, 935 (2013) ("When an organization engages in independent expenditures as well as campaign contributions . . . its independence may be called into question and concerns of corruption may reappear. At the very least, the public may believe that corruption continues to exist, despite the use of separate bank accounts, because both accounts are controlled and can be coordinated by the same entity."); *cf. Emily's List*, 581 F.3d at 11-12 ("A non-profit that makes expenditures to support federal candidates does not suddenly forfeit its First Amendment rights when it decides also to make direct contributions to parties or candidates. Rather, it simply must ensure, to avoid circumvention of individual contribution limits by its donors, that its contributions to parties or candidates come from a hard-money account.").

[45] *See, e.g.*, *Stop this Insanity, Inc. Emp. Leadership Fund v. FEC*, 902 F. Supp. 2d 23, 43 (D.D.C. 2012).

contribution of the email list, though we do so on considerably narrower grounds than embraced by the district court.

Texas has decided, as the Supreme Court's campaign-finance jurisprudence permits, to entirely ban corporate contributions to candidates. *See, e.g.*, *FEC v. Beaumont*, 539 U.S. 146, 149 (2003) ("Since 1907, federal law has barred corporations from contributing directly to candidates for federal office. We hold that applying the prohibition to nonprofit advocacy corporations is consistent with the First Amendment.").[46] In turn, Texas's ban on corporate contributions to political committees engaging in political contributions serves as an anticircumvention measure to prevent corporations from using a political committee to do an end-run around Texas's direct contribution ban. *Cf. Emily's List*, 581 F.3d at 11-12 (explaining that political committees that make contributions can be required to make contributions from a hard money account subject to contribution limitations); *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 292 (4th Cir. 2008) (noting corruption risk arising from committees funneling money to candidates). And the Plaintiffs do not deny that email mailing lists, and the email addresses that comprise them, have actual monetary value and can be sold.[47] Accordingly, it seems

---

[46] *See also In re Cao*, 619 F.3d at 422 ("[W]e do not read *Citizens United* as changing how this court should evaluate contribution limits . . . .").

[47] *See, e.g.*, *'Electioneering' Is Its Own Industry*, Clarion-Ledger (Jackson, Miss), June 18, 2014, at A10 ("A component of having a steady stream of dollars is to have a good mailing list—and such a list with direct contact information to those with a history of giving is as valuable as the gold the list generates."); Luke Rosiak, *Gingrich's Campaign Payments Spark Questions*, Wash. Times, Feb. 20, 2012, at A1 ("Mr. Gingrich personally sold his campaign a mailing list of names of supporters for nearly $50,000 . . . ."); Molly Ball, *Sharron Angle, Joe Miller, Christine O'Donnell Fall Forward After 2010 Flops*, Politico (Mar. 25, 2011, 2:11 PM), http://www.politico.com/news/stories/0311/51950.html ("[T]oday's failed candidates came away from the election with something perhaps more valuable than a seat in Congress: email lists of supporters and small donors numbering in the tens of thousands."); Mike Allen, *Bush Goes for 'Icing' in Louisiana; GOP Pours Cash Into Senate Race Viewed as '04 Test*, Wash. Post, December 4, 2002 ("Besides raising $1.3 million for Terrell today, Bush has given her

No. 13-50582

that Texas has a valid anticorruption interest in ensuring that a corporation cannot use a political committee to transfer an email mailing list from the corporation to a candidate. Even if the state does not have an anticorruption interest in limiting contributions intended to support independent expenditures, *see, e.g.*, *Texans for Free Enter.*, 732 F.3d at 538-39, the state does have an anticorruption interest in ensuring those donations facilitate only independent expenditures.

The parties dispute whether Texas's anticorruption interest extends to blocking the corporate donation of an email mailing list when the political committee assures the state that the mailing list will only be used in support of independent expenditures. To support their arguments that Texas cannot constitutionally block the contribution, Plaintiffs point to two sources of authority: (1) case law holding that governments cannot bar corporate contributions to independent-expenditure-only political committees,[48] and (2) case law suggesting that the government cannot regulate contributions to hybrid political committees provided that the unlimited contributions are kept in a soft-money account separate from the political committee's hard-money account (which remains subject to a contribution limit).[49] Texas counters by (1) distinguishing the cases dealing with independent-expenditure-only committees on the basis that the general-purpose committee at issue here is not an independent-expenditure-only committee, and (2) pointing to case law suggesting that a state may regulate contributions to hybrid PACs even where

---

campaign rare access to his database of national donors, which one official called the most valuable mailing list in politics.").

[48] *See, e.g.*, *Texans for Free Enter.*, 732 F.3d at 537-38.

[49] *See, e.g.*, *Republican Party of N.M.*, 741 F.3d at 1097-98; *Emily's List*, 581 F.3d at 11-12.

the committee suggests that the funds will only be used for independent expenditures.[50]

We agree with Texas that the cases dealing with independent-expenditure-only committees are not particularly helpful for Plaintiffs' claims. As such, we focus on the case law dealing with hybrid political committees that both engage in independent expenditures and make political contributions. But those cases do not help the Plaintiffs either. Regardless of the constitutionality of contribution limitations on donations to hybrid PACs that are earmarked solely for use on independent expenditures, the premise underlying all of the decisions cited by both parties is that the state is permitted to undertake some reasonable measures to ensure that any contribution limitations are not circumvented. The courts examining the issue simply disagree as to what those measures may be. This case differs from even the authorities relied on by the Plaintiffs insofar as the Plaintiffs here seem almost willful in not explaining what safeguards are in place to ensure the donated email mailing list will only be used in support of independent expenditures other than the general-purpose committee's own good intentions. *Accord Republican Party of N.M.*, 741 F.3d at 1097-98 (noting existence of segregated accounts protects the state's anticorruption interest); *Emily's List*, 581 F.3d at 11-12 (same).

The Plaintiffs' failure to so explain any actual safeguards beyond potentially opening a separate bank account to deposit contributions raised with the email list is dispositive of their as-applied challenge. Though we do not weigh in on the precise safeguards that must be present (such as a segregated hard money account or the like)—or whether any level of

---

[50] *See, e.g.*, *Vt. Right to Life Comm., Inc.*, 2014 WL 2958565, at *18-19; *Ala. Democratic Conference*, 541 F. App'x at 935.

safeguards is sufficient—before a state lacks a sufficient anticorruption interest to regulate contributions to a hybrid PAC earmarked for independent expenditures, we hold that the state's interest in preventing *quid pro quo* corruption and its appearance permits the state to insist, at the very least, that there is *some* safeguard before permitting the contributions of items of fungible value. The state need not trust solely in its disclosure regulations and a committee's good faith to prevent *quid pro quo* corruption and its appearance. *Cf. Buckley*, 424 U.S. at 27-28 ("Congress was surely entitled to conclude that disclosure was only a partial measure, and that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed."). And that narrow determination is the only one we need to make to resolve Plaintiffs' as-applied challenge.

In order to defend its prohibition on Plaintiffs' proposed contribution, Texas must show "a sufficiently important interest and employ[] means closely drawn." *McCutcheon*, 134 S. Ct. at 1444. Texas has an anticircumvention interest in preventing corporations from evading its ban on corporate contributions to candidates through corporate contributions to a general-purpose committee that (1) engages in independent expenditures and corporate contributions and (2) lacks sufficient internal controls to safeguard against the risk that the corporate contributions, even if formally earmarked for independent expenditures, could be funneled to a candidate. That anticircumvention interest represents a sufficiently important state interest. *Cf. Colorado Republican II*, 533 U.S. at 431 (approving of anticircumvention as a valid theory of combatting corruption). Likewise, Texas's complete ban on Plaintiffs' proposed contribution is closely drawn to its anticircumvention interest insofar as Plaintiffs have failed to provide any clear safeguard that

sufficiently assures that no part of the corporate contribution will end up being transferred to a candidate.

We AFFIRM that Texas Election Code § 253.094(a)'s restriction on corporate contributions to a general-purpose committee is constitutional as-applied to the in-kind contribution of an email mailing list from Texas Leadership Coalition to the Texas Leadership Coalition-Institute for Public Advocacy.

## IX.

We AFFIRM the district court's grant of summary judgment that the treasurer-appointment requirement is constitutional facially and as-applied. We AFFIRM the district court's grant of summary judgment that the corporate contribution ban is constitutional as-applied to the in-kind contribution of an email mailing list from Texas Leadership Coalition to the Texas Leadership Coalition-Institute for Public Advocacy. We REVERSE the district court's determinations that the 60-day, 500-dollar limit and the ten-contributor requirement are constitutional, and RENDER judgment that the 60-day, 500-dollar limit and ten-contributor requirement are facially unconstitutional as contrary to the First Amendment. Finally, we REMAND for further proceedings consistent with this opinion.